FILED

2010 Apr-13  AM 10:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ANDREA JORDAN and MARY SNOW, | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | **2:09-cv-215-JHH** |
| VS. | ) | |
| | ) | |
| JEFFERSON COUNTY BOARD OF EDUCATION; PHIL HAMMONDS; | ) | |
| JACQUELINE A. SMITH; TOMMY LITTLE; KAREN NIX; | ) | |
| RONALD RHODES; and | ) | |
| JENNIFER PARSONS, | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## MEMORANDUM OF DECISION

The court has before it the January 20, 2010 motion (doc. # 15) of Defendants the Jefferson County Board of Education ("the Board"), Phil Hammonds, Jacqueline A. Smith, Tommy Little, Karen Nix, Ronald Rhodes and Jennifer Parsons for summary judgment. Pursuant to the court's January 20, 2010 and February 8, 2010 orders (docs. #16 & 21), the motion was deemed submitted, without oral argument, on March 3, 2010. Having considered the briefs and evidentiary submissions, the court finds that Defendants' motion is due to be granted for the reasons outlined below.

**I. Procedural History**

Plaintiffs Andrea Jordan and Mary Snow commenced this action on February 4, 2009 by filing a complaint in this court alleging a violation of the Equal Protection Clause of the United States Constitution, brought pursuant to 42 U.S.C. § 1983. (Compl. ¶ 16.)  The complaint also alleges a violation of the Equal Protection Clause of the Constitution of Alabama and a breach of contract under Alabama law.  (Id. ¶¶ 16, 24.)  Defendants' January 20, 2010 motion (doc. #15) for summary judgment asserts that no material dispute of fact exists and that Defendants are entitled to judgment as a matter of law.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendants submitted a brief (doc. # 18) and evidence[1] (doc. # 19) in support of its own motion for summary judgment on January 27, 2010.  On February 24, 2010, Plaintiffs filed a brief (doc. # 25) and evidence[2] (doc. # 26) in

---

[1] The defendant submitted the following evidence: deposition of Andrea Jordan with exhibits; deposition of Mary Snow with exhibits; deposition of Lawrence Carter with selected exhibits; deposition of Phil Hammonds with exhibits; deposition of Shelia Jones with exhibits; affidavit of Lawrence Carter with attached exhibits; affidavit of Melissa Johnson with attached exhibit.

[2] The plaintiff submitted the following evidence: deposition of Andrea Jordan; deposition of Mary Snow; deposition of Lawrence Carter; deposition of Phil Hammonds; deposition of Shelia Jones; Jefferson County Board of Education Job Description - Administrative Aide; August 25, 2005 Memorandum RE: 9 ½ Month Office Assistants; Recommendation to Reclassify Jordan as Office Assistant I; Reclassification of Jordan as Office Assistant I; Reclassification of Snow as Office Assistant I; November 2, 2005 Letter from Jones

2

opposition to Defendants' motion for summary judgment.  On March 3, 2010, Defendants filed a brief (doc. # 27) in reply to Plaintiffs' opposition.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

---

to Hammonds; January 14, 2008 Memorandum re: Salary Schedule Sub-Committee; April 21, 2008 Memorandum re: Recommendation - Revision in Salary Schedule; April 24, 2008 Board Minutes; Reclassification of Jordan and Snow as Office Assistant II; 2008 Salary Schedule for Office Assistants; 2008 Salary Schedule for Social Workers; 2008 Salary Schedule for Registered Nurses; Report of Central Office Building NextGen users.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer

5

rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[3]

Plaintiff Andrea Jordan was hired by the Board in 1982 and worked as an Office Assistant at Grantswood Community School[4] until her retirement in July 2009.  (Jordan Dep. at 7, 18, 20.)  During most of her employment, Jordan worked as an Office Assistant IV - 9 months.  (Id. at 13.)  Plaintiff Mary Snow began working as a Media Aide (Library Assistant) at Hillview Elementary School[5] during the 1998-1999 school year.  (Snow Dep. at 12.)  Both Plaintiffs jobs changed, however, when the Board created a new 9.5 month Office Assistant position.

*A. Office Assistant Structure*

---

[3] If the facts are in dispute, they are stated in a manner most favor to the non-movant.  See Fitzpatrick, 2 F.3d at 1115.  The court notes that these are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).

[4] Grantswood is a smaller school that educates children in kindergarten, first and second grades.  (Carter Aff. ¶ 4.)

[5] Hillview is one of Jefferson County's smallest elementary schools.  (Carter Aff. ¶ 4.)

During the 2004-05 school year, the Board had three classifications of Office Assistants: (1) Office Assistant I - 12 month; (2) Office Assistant III - 10 month; and (3) Office Assistant IV - 9 month.[6] (Id. at 50-52.)  During this time, the office staff at Jefferson County Schools was generally comprised on an Office Coordinator[7] and additional Office Assistants and Clerical Aides, as needed, depending on the size and needs of the school.  (Id. at 52.)  Because by the end of the 2004-05 school year the school system began to phase out the Office Assistant III - 10 month position,[8] schools were generally comprised of an Office Coordinator and either an Office Assistant I - 12 month or an Office Assistant IV - 9 month.  (Id. at 51-52.)

Generally, the distribution of support staff in the schools coincides with the size of the school.  (Carter Dep. at 84; Carter Aff. ¶ 3.) For example, in addition to the Office Coordinator, larger high schools typically have a Office Assistant I - 12 month, and, depending on enrollment, additional Office Assistants IV - 9 month.  (See Carter Aff. ¶ 3.)  In contrast, a small elementary school may only have an Office Assistant

---

[6] The record does not show why there was not an "Office Assistant II" at this time.

[7] Office Coordinators, which is a 12 month position, have primary responsibility for financial management functions, such as school bookkeeping, purchase orders and state requisition processing, payroll administration, fundraising duties, and bank deposits.  (Carter Dep. at 53.)  They also provide secretarial support to the school principal.  (Id.)  The Office Coordinator position is not at issue in this case.

[8] There were only two Office Assistant III - 10 month employees in the school system at that time.  (Carter Dep. at 71.)

7

IV - 9 month, along with the Office Coordinator.  (Id.)  This allocation scheme is predicated on the general tendency of larger schools to be "hubs of year-round school and community activity, such as summer school, sports programs, community meetings" and the like.  (Id.)  These activities associated with a larger school require year-round office staffing.  (Id.)

    *B.  Creation of the 9.5 Month Office Assistant*

In November 2004, the Board established a Salary Sub-Committee to propose adjustments to the salary schedule of the school system to make the system more competitive in both attracting and obtaining quality employees.  (Carter Dep. at 35-36.)  The area most impacted by the recommended salary revisions was in the area of clerical or support workers, which included Office Assistants.  (Id. at 37.)    On December 20, 2004, the Salary Sub-Committee recommended a five percent  hourly wage increase for Office Assistant I -12 month from $9.71 to $10.25.  (Id. at 38.)  It also recommended a one hour increase in work-time from 6.5 to 7.5 hours per day.  (Id. at 39.)  Finally, the Sub-Committee recommended that each school that did not have a 10 or 12 month Office Assistant should designate one 9 month Office Assistant to be reclassified to work 9.5 months.  (Id. at 38-39.) The 9.5 month classification was recommended in response to requests from smaller school principals for additional clerical assistance immediately following the closing of

school, preceding the opening of school, and during registration.  (Hammonds Dep. at 34; Exhibit 5 to Hammonds Dep.; Carter Dep. at 183.)

In June 2005, the recommendations of the Salary Sub-Committee were submitted to the Board by Superintendent Hammonds.  (Id. at 35.)  Following the recommendation, three classifications of Office Assistants were created: (1) Office Assistant I - 12 month or 9.5 month[9]; (2) Office Assistant III - 10 month; and (3) Office Assistant IV - 9 month.  (Id. at 39; Pl. Ex. 8.)  The Board also approved a new job description for Office Assistant I - 12 month in June 2005.  (Pl. Ex. 6.)  The Board, however, did not create a job description for the new Office Assistant I- 9.5 month position.  (Carter Dep. at 55-56.)  Instead, the Board used the same job description as the Office Assistant IV - 9 months, entitled Administrative Aide, for the new 9.5 month position, even though this job description did not accurately reflect the requirements of the new position.  (Id. at 55-57; Pl. Ex. 7.)

In an effort to implement the new 9.5 month position, the Deputy Superintendent, Jerry Mitchell, sent a memorandum to select principals.  (See Pl. Ex. 8.)  The memorandum  instructed the schools that did not have a 10 or 12 month

---

[9] Although Carter testified that the 9.5 month position was classified as an Office Assistant II, this classification did not occur until later.  (Compare Pl. Ex. 8 with Pl. Ex. 14.)

Office Assistant (i.e. the smaller schools) to "designate one 9-month Office Assistant IV to be reclassified as an Office Assistant I (192 days - 9.5 months) . . . ." (Id.)

Both Plaintiff Jordan and Plaintiff Snow were promoted to the new position. In August 2005, Jordan was recommended by the Grantswood principal to be reclassified as an Office Assistant I - 9.5 month.[10] (Pl. Ex. 9.) She accepted, and the reclassification became effective August 8, 2005. (Jordan Dep. at 13-14; Pl. Ex. 10.) Snow, on the other hand, applied for and received the position of Office Assistant I - 9.5 months in February 2007 at Hillview Elementary.[11] (Snow Dep. at 16-17; Pl. Ex. 11.)

### C. Office Assistant Duties

The Board maintains that 12 month Office Assistants and 9.5 month Office Assistants have different responsibilities and perform different duties. According to the Board, the 12 month Office Assistants are often responsible for compiling and delivering the payroll service report, entering purchase orders and state requisitions and receipting funds at the local school level. (Jones Dep. at 15-16.) The 12 month Office Assistants perform a number of financial functions that require training and access to the Board's financial accounting software, NextGen, and also assume

---

[10]   There was not an Office Assistant I - 12 month at Grantswood. (Jordan Dep. at 18.)

[11]   There was not an Office Assistant I - 12 month at Hillview. (Snow Dep. at 20.)

potential personal liability if school funds are lost, misspent or not properly accounted for.  (Id.; Ex. A to Johnson Dep.; see also Ala. Code §§ 16-13A-7 & 16-13A-10.) Further, the 12 month Office Assistants support the work of the Office Coordinator and directly assume and perform a full range of duties, tasks and functions of the coordinator, especially when the coordinator is absent, on vacation or otherwise unavailable.  (Jones Dep. at 15-16; Carter Dep. at 56-58.)

In contrast, according to the Board, the 9.5 month Office Assistant position, however, does not have these extensive, financial responsibilities.  The Board contends that  when the 9.5 Office Assistant position was created, these individuals were not assigned additional duties because of the reclassification, but were performing the same duties for ten additional days a year.  (Hammonds Dep. at 136-37; Jones Dep. at 30; Jones Dep. at 15-16, 29; Carter Dep. at 184.)  For instance, Plaintiff Jordan testified that before her reclassification, she performed typical office duties such as answering the phone, photocopying for teachers, greeting visitors in the office, and maintaining student files.  (Jordan Dep. at 9-10, 17.)  She also assisted with student attendance, collected money for fundraisers,[12] and entered discipline records for some principals.  (Id. at 11-12.)  Additionally, she acted as the school

---

[12]  Jordan would collect the money, prepare the deposit and do "all the paperwork," but the Office Coordinator would deposit the money and "enter[] it in the books."  (Jordan Dep. at 12.)

nurse, by taking children's temperatures, assessing their problems, and deciding whether to call their parents.  (Id. at 35-36.)  When her position changed to a 9.5 month Office Assistant, Jordan testified that her job changed "somewhat" in that she "started helping with registration."  (Id. at 15-16.)   Jordan testified that she never used NextGen or played any part in purchase orders, payroll or state requisitions, as those things were handled by the Office Coordinator at her school.  (Id. at 22.)

Similarly, Plaintiff Snow testified that her job duties at a 9.5 month Office Assistant include typical office and clerical support duties such as taking messages for teachers, greeting visitors in the office, photocopying and sending faxes.  (Snow Dep. at 18-19.)  She also assists with attendance, documentation of disciplinary actions and the lunchroom program, SNAP.[13]  (Id.)  Additionally, because her school does not have a full-time nurse, Snow distributes medications and is the person who helps with the sick children.  (Id. at 19.)  She does all the leaflets for fundraising,

_____

[13] SNAP is the "reduced lunch program that the school has through Jefferson County that has verification of free and reduced lunch forms to see who qualifies and disqualifies for that program.  All that material has to be logged and then after it's logged and evaluated at step one, it goes downtown for the personnel and the nutrition program to evaluate it."  (Snow Dep. at 23.)  Snow further explained as follow:

> Lunch forms come in as new students come into the school.  And whenever a parent has a job to either get terminated or to pick up a new job and there is a classification change or their life-style changes, they are permitted to come back and fill out another lunch form to be able to see if they are eligible for a further reduction in the amount they have to pay for lunch.

(Id.)

gathers fundraising monies,[14] and "referrals that go downtown, " as well as delivering deposits to the bank. (Id. at 19, 21.) Snow stated that she was not involved with payroll,[15] purchase orders,[16] state requisitions, bookkeeping, nor has she used NextGen. (Id. at 26-27, 38-39.)

Contrary to the above testimony, throughout their complaint and brief to this court, Plaintiffs Jordan and Snow maintain that they perform essentially the same duties as the 12 month Office Assistants. Specifically, Jordan testified that she believed that she did "pretty much the same" duties as a 12 month Office Assistant. (Jordan Dep. at 19.) She admitted, however, that she never worked with a 12 month Office Assistant, nor had she personally seen what a 12 month Office Assistant does, and had never seen a job description for the position before preparing for her deposition. (Id. at 18, 20.) Likewise, Snow testified that she believed that her duties matched the duties of a 12 month Office Assistant:

> The job description that I do [9.5 month Office Assistant]
> and that are on record for that job duty [12 month Office
> Assistant]  is basically the same relations to mine.  I do

---

[14] Snow explained that each teacher has a receipt book and she takes up the money and handwrites the receipt for the individual classroom. (Snow Dep. at 21.)

[15] Snow does make sure the teachers sign in each morning and turn in their time sheets. (Snow Dep. at 26.) She does not review the time sheets or do payroll. (Id.)

[16] Snow stated that she fills out purchase orders, but does not generate them. (Snow Dep. at 27.)

> answer the phone.   I do run all the machines.  I do that
> withdrawals.  I do the lunch programs.  I do a plethora of
> job duties that both consist of the twelve months and nine
> and a half months.  Very little that I don't do of those [that]
> do not match that description [of the 12 month Office
> Assistant].

(Snow Dep. at 57.)  Snow admitted, however, that she has never worked with a 12

month Office Assistant, but she has talked with someone who is in that position.  (Id.

at 58.)

> D.   *The November 2005 Complaint*

On November 2, 2005, the Board received a letter from a staff representative

of the teacher's union regarding the pay of Office Assistants I who worked 9.5

months.  (Pl. Ex. 12.)  The letter discussed the difference in pay between the Office

Assistant I - 12 month and Office Assistant I - 9.5 month and urged the Board to

equalize the pay of the two positions:

> There seems to be some confusion since some school
> assistants have been reclassified to the Office Assistant I
> position.  The 12 month Office Assistant I makes $14.61
> per hour . . ., [while] the 9 ½ Office Assistant I makes
> $10.60 . . . .  We feel that it would be appropriate for these
> employees to make the same amount of money per hour.
> The 12 month Office Assistant I would still have a higher
> salary because they work more days.  Also consider the
> fact that these employees now work 10 more days per year
> and 1 more hour per day.

14

(Id.)  The letter further emphasized that because the 9.5 month Office Assistants worked in the smaller schools that did not have 12 month Office Assistants, the former were performing extra duties without compensation.  (Id.)

### E.  Salary Adjustment and Creation of Office Assistant II

Sometime in late 2007 or early 2008, a Salary Sub-Committee was formed to review the compensation of the 9.5 month Office Assistants.  (See Pl. Ex. 13.)  The Sub-Committee's recommendation was sent to Superintendent Phil Hammonds on January 14, 2008.  (Id.)  The recommendation included a revision of the salary schedule for Office Assistant I- 9.5 months to increase their pay.  (Id.)  The pay increase, however, did not raise the pay rate to the same hourly rate as Office Assistant I - 12 month.  (See Pl. Ex. 17.)  On April 24, 2008 the recommendations were adopted, with an effective date of July 1, 2008.  (Pl. Exs. 14 & 15.)  Further, the title of the position changed to Office Assistant II - 9.5 months.  (Id.)  Both Plaintiffs Jordan and Snow were reclassified as Office Assistant II employees on July 1, 2008. (Pl. Ex. 16.)

## IV. Applicable Substantive Law and Analysis

Plaintiffs Jordan and Snow's complaint contains two claims.  First, the complaint alleges that the Board violated the Equal Protection Clause of the United

States Constitution and of the Alabama Constitution[17] when it paid 9.5 month Office

Assistants less than it paid 12 month Office Assistants. Second, the complaint alleges

that Defendants "improperly classifi[ed] Plaintiffs as Office Assistant I 9 ½ months

and subsequently Office Assistant II . . . [,] breached their written policies and salary

schedule," violated "school board policy and . . . breach[ed] . . . [a] contract."

(Compl. ¶¶ 23-24.)  The court addresses each claim separately below.

### A.  Plaintiffs' Equal Protection Claims Fail as a Matter of Law.[18]

Section 1983 proscribes conduct that deprives a person of rights, privileges, or

immunities secured by the Constitution or laws of the United States, West v. Atkins,

487 U.S. 42, 48 (1988) (citations omitted); Holmes v. Crosby, 418 F.3d 1256, 1258

(11th Cir. 2005), and permits a plaintiff to obtain civil damages from any person who

deprives him of constitutional rights, so long as that person is acting under color of

state law.  42 U.S.C. § 1983. "[T]he Equal Protection Clause requires government

---

[17] Although Plaintiffs' complaint includes Equal Protection claims under both the United States and Alabama Constitutions, the analysis of the federal claim is "equally applicable" to the state claim.  Jefferson County v. Braswell, 407 So.2d 115, 122 (Ala. 1981).  As such, the court does not separate the discussion, but considers its analysis as applied to both claims.

[18] Although Defendants initial brief contends that Plaintiff Jordan's claim is barred by the statute of limitations (doc. # 18 at 8), Plaintiffs correctly note that this argument is misplaced (doc. #25 at 12-13), and Defendants implicitly concede such as they do not address the statute of limitations argument in their reply brief.  See Thigpen v. Bibb County, Ga. Sheriff's Dept., 223 F.3d 1231, 1243 (11th Cir. 2000) and Calloway v. Partner Nat'l Health Plans, 986 F.2d 446, 449 (11th Cir. 1993).  The court, therefore, does not address the argument further other than referencing the above citations to binding case law.

entities to treat similarly situated individuals alike." Campbell v. Rainbow City, 434

F.3d 1306, 1313 (11th Cir. 2006); see also Gary v. City of Warner Robins, Ga., 311

F.3d 1334, 1337 (11th Cir. 2002).

> 1.  9.5 Month Office Assistants are not Similarly Situated to 12 Month
>     Office Assistants.

At the crux of a successful equal protection claim is the similarity of the two

comparators. Different treatment of dissimilarly situated persons does not offend the

Equal Protection Clause.  Id. at 1314 (citing E & T Realty v. Strickland, 830 F.2d

1107, 1112 (11th Cir. 1987)).   Equal protection plaintiffs must provide specific

details in making their claims so the court may determine whether the proposed

comparator was similarly situated in "all relevant respects." Campbell, 434 F.3d at

1314 (citing Strickland v. Alderman, 74 F.3d at 264-65; Racine Charter One, Inc. v.

Racine Unified School Dist., 424 F.3d 677, 680 (7th Cir. 2005) (finding that "[t]o be

considered 'similarly situated,' comparators must be prima facie identical in all

relevant respects")); see also Griffin Industries, Inc., v. Irvin, 496 F.3d 1189 (11th

Cir. 2007); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316-19 (11th Cir.

2003).  Although whether individuals are similarly situated is generally a factual

question, "a court may properly grant summary judgment where it is clear that no

reasonable jury could find that the similarly situated requirement has been met."

McDonald v. Village of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004) (citations

omitted).

The record clearly establishes that no reasonable jury could find that 9.5 month

Office Assistants are similarly situated to 12 month Office Assistants.   The

differences in these positions is most apparent through the testimony of both

Plaintiffs.  Both Jordan and Snow testified at length about their duties as 9.5 month

Office Assistants, and listed duties, including the following: answering the phone,

photocopying for teachers, greeting visitors in the office, maintaining student files,

assisting with student attendance and lunchroom food voucher program, collecting

money for fundraisers, making deposits at the bank, entering discipline records,

acting as the school nurse, and helping with registration.  (Jordan Dep. at 9-12, 15-17,

35-36; Snow Dep. at 18-19, 21.)  In contrast, the record shows that 12 month Office

Assistants had different responsibilities that mainly revolved around school finances.

These responsibilities include compiling and delivering the payroll service report,

entering purchase orders and state requisitions and receipting funds at the local school

level.  (Jones Dep. at 15-16.)  The 12 month Office Assistants are trained in the use

of the Board's financial accounting software, NextGen,[19] and assume potential

_____

[19] That two 9.5 month Office Assistants have access to NextGen does not negate this
differentiation.  All thirty 12 month Office Assistants use the software, and neither Plaintiff has
ever used or, judging from their testimony, seen the software.

personal liability for lost, misspent, or unaccounted for public funds. (Ex. A to Johnson Aff.; Ala. Code §§ 16-13A-7 & 16-13A-10.)

The self-serving testimony of Plaintiffs that they perform essentially the same jobs and duties as 12 month Office Assistants (Jordan Dep. at 18-20; Snow Dep. at 57-58) is unpersuasive. Neither Jordan nor Snow has ever worked with a 12 month Office Assistant nor has either seen what job duties a 12 month Office Assistant performs. (Id.) Merely reading the job description before and during a deposition and comparing it to Plaintiffs' responsibilities is not sufficient.

In sum, the court concludes that 12 month Office Assistants are not similarly situated to 9.5 month Office Assistants for the reasons stated above. Because Different treatment of dissimilarly situated people does not violate the Equal Protection Clause, Plaintiffs' claims fail as a matter of law. Summary judgment, therefore, is due to be granted as to Plaintiffs' claims under 42 U.S.C. § 1983.

> 2. The Difference in Compensation is Rationally Related to a Legitimate Interest.

Additionally, Plaintiffs' section 1983 claims fail because the difference in compensation is rationally related to a legitimate interest of the Board. Plaintiffs do not allege that they are the victim of invidious class-based discrimination or that they are members of a suspect class. Instead, both sides agree that Plaintiffs claims are

19

properly analyzed under the rational basis test: the law need only have a rational basis -- i.e., it need only be rationally related to a legitimate government purpose.  Eide v. Sarasota County, 908 F.2d 716, 722 (11th Cir.1990).  Therefore, the court must decide whether the Plaintiffs' compensation is rationally related to a legitimate interest of the Board.  Id.

The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it.  Cash Inn of Dade, Inc. v. Metro. Dade County, 938 F.2d 1239, 1241 (11th Cir. 1991).  This standard is easily met. As the Supreme Court has held, under rational basis review, a state "has no obligation to produce evidence to sustain the rationality of a statutory classification." Heller v. Doe by Doe, 509 U.S. 312, 320 (1993). Rather, a statute is presumed constitutional, and the burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record.  Id. Under rational basis review, a court must accept a legislature's generalizations even when there is an imperfect fit between means and ends.  Id.

Plaintiffs argue that "there is no rational basis for the distinction between Office Assistant I, 12 month employees and Office Assistant I, 9.5 month employees

. . . ." (Doc. #25 at 14.)  The court disagrees.  The Board proffers two rational reasons for the difference in pay:[20] (1) 12 month Office Assistants are required to perform greater responsibilities, including payroll, bookkeeping, purchasing and requisitions, and use of the financial accounting software, Nextgen, and are exposed to potential personal liability for lost, misspent, or unaccounted for public funds.  (Jones Dep. at 15-16; Ex. A to Johnson Aff.; Ala. Code §§ 16-13A-7 & 16-13A-10 ); and (2) 12 month Office Assistants work year round, including all the summer months, and are responsible for the proper uninterrupted functioning of the entire office without support from other clerical office employees.  (Hammonds Dep. at 51, 54, 55; Jones Dep. at 15-16; Carter Dep. at 57-58, 108.)  Underlying these two articulations is the recognition by the Board that because the 12 month Office Assistants assume greater responsibilities, the higher pay is not only justified, but well-deserved. These two articulations easily meet the standard required by the Eleventh Circuit and Alabama. See Houston v. Williams, 547 F.3d 1357, 1363 (11th Cir. 2008); Coosa County Bd. of Educ. v. Hamilton, 778 So.2d 831, 836 (Ala. Civ. App. 2000); Hughes v. Jefferson County Bd. of Educ., 370 So.2d 1034, 1036 (Ala. Civ. App. 1979).  Therefore, it becomes Plaintiffs' unenviable task of negating the reasons supporting the

---

[20] It is undisputed that the Board has the authority to regulate the salaries of these employees.

compensation difference.  Jackson v. State Bd. of Pardons and Paroles, 331 F.3d 790, 797 (11th Cir. 2003) (The plaintiff "bears the heavy burden of negat[ing] every conceivable basis which might support [the statute], whether or not the basis has a foundation in the record." (internal citations and quotations omitted)).

Plaintiffs make two arguments in an attempt to meet this "heavy burden."  Id. First, Plaintiffs contend that the duties and responsibilities of 9.5 month Office Assistant are essentially the same as those of the 12 month Office Assistant.  (Doc. #25 at 14-17.)  This argument fails for the reasons stated supra in Section IV.A.1, where the court analyzed the differences in the positions and concluded that the record established that 12 month Office Assistant position was not similarly situated to the 9.5 month Office Assistant.

Although the differences in duties and responsibilities alone is a rational basis for the difference in pay, Plaintiffs make another argument.  Plaintiffs contend that the difference in the duration of employment does not justify the  higher pay scale for the 12 month Office Assistants.  (Doc. # 25 at 18-19.)  They attempt to negate this rational reason for the pay differential by highlighting the fact that social workers and nurses employed by the Board are all paid the same rate, regardless of the duration of their employment.  (Id.; Jones Dep. at 23, 2; Pl. Exs. 18 & 19.)  This argument, however, is misplaced, as Office Assistant, social worker, and nurse positions cannot

22

be compared in this way.  First, nurses and social workers are all doing the same job, regardless of the months they work.  Office Assistants, on the other hand, do different jobs depending on the duration of their employment, as discussed in detail above.  Second, nurse salaries are based on a salary matrix approved by the Alabama legislature and required by state law.  (Jones Dep. at 26.)  Similarly, social worker positions are viewed as a certified position, much like teachers, and have a salary schedule that is mandated by the state of Alabama.  (Id. at 24.)

In summary, Plaintiffs have failed to establish a violation of the Equal Protection Clause of either the United States Constitution or the Alabama Constitution.  They have failed to offer evidence by which a reasonable jury could conclude that the 9.5 month Office Assistant is similarly situated to the 12 month Office Assistant.  Additionally, Plaintiffs have failed to negate the rational reasons asserted by the Board for the differential in salary.  Therefore, summary judgment is due to be granted to the Board and to the individual Defendants in their official capacity as to these claims.

B.  *The Individual Defendants are Entitled to Qualified Immunity*.

Superintendent Phil Hammonds and the other members of the Board, Jacqueline A. Smith, Tommy Little, Karen Nix, Ronald Rhodes and Jennifer Parsons, are sued in both their official and individual capacities.  (Compl. ¶¶ 4,6.)  In contrast

23

to official capacity claims, individual capacity claims seek monetary recovery payable out of the responsible official's personal finances, so they are not duplicative of claims against governmental entities.  See Hafer v. Melo, 502 U.S. 21, 25 (1991). Individual capacity claims, however, are subject to the common-law defense of qualified immunity, and here all the individuals claims that defense in their answer and motion for summary judgment.  (See Answer; Doc. # 18 at 17-19.)

Qualified immunity utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless her actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them."  GJR Investments, Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1366 (11th Cir. 1998).  The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity."  Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir.1994).  "We generally accord . . . official conduct a presumption of legitimacy."  United States Department of State v. Ray, 502 U.S. 164, 179 (1991).

Under the qualified immunity doctrine, government officials performing discretionary functions are immune from suit unless the alleged conduct violates

24

"clearly established [federal] statutory or constitutional rights of which a reasonable person would have known."[21] Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  Hope v. Pelzer, 122 S. Ct. 2508, 2515 (2002) (internal quotations omitted).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[22]  Pelzer, 122 S. Ct. at 2515 (internal quotations omitted); see also Anderson v. Creighton, 483 U.S. 635,640 (1987).

       A threshold inquiry to the qualified immunity defense is whether the government official was acting in the line and scope of her discretionary authority. Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009); Holloman ex rel. v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing Harlow, 457 U.S. at 818).  It is the burden of the governmental official to make this showing.  Storck v. City of Coral

---

[21] "It is the plaintiff's job to show that the defendant's actions violated clearly established constitutional law" if qualified immunity is to be overcome.  Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir. 1989) (citation omitted).

[22] For federal law to be clearly established, there must be fairly close factual correspondence between the prior precedents and the case at hand.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Rioux v. City of Atlanta, 520 F.3d 1269, 1283 (11th Cir. 2008) ("The 'clearly established' prong of the qualified immunity analysis asks the question 'in light of the specific context of the case, not as a broad general proposition.'") (quoting Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1269 (11th Cir. 2003)).

Springs, 354 F.3d 1307, 1314 (11th Cir. 2003) ("Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place.").

       1.  The Individual Defendants were Performing a Discretionary Function.

Historically, a "discretionary function" was defined as an activity requiring the exercise of independent judgment and was distinguished from a "ministerial task." See, e.g., Williams v. Wood, 612 F.2d 982, 984-85 (5th Cir. 1980).  In the qualified immunity context, the Eleventh Circuit abandoned this approach by interpreting "discretionary authority" to include actions that do not involve an element of choice. Holloman ex rel. Holloman, 370 F.3d at 1265.  Indeed, Holloman makes clear that "for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function."  Id.

The "discretionary function" analysis therefore does not focus on whether the act involved the exercise of actual discretion; rather, the inquiry is whether the act fell within the employee's job responsibilities.  Id. The Eleventh Circuit has articulated a two-part test: (1) whether the employee was performing a legitimate job-related function or pursuing a job-related goal, (2) through means that were within his power to utilize.  Id.; see also Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 (11th Cir. 1994) ("A government official acts within his or her discretionary authority

26

if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority."). The Eleventh Circuit elaborated that:

> [T]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology. In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

Holloman, 370 F.3d at 1265 (internal quotation marks omitted).

Consequently, the discretionary function analysis presents the classic "level of generality" problem, where the outcome of the analysis depends entirely upon the level of generality at which the inquiry is conducted. See Holloman, 370 F.3d at 1266. For the purposes of this analysis, a court must examine the defendant's actions at the lowest possible level of generality necessary to remove the constitutional taint. Id. For example, in Sims v. Metropolitan Dade County, 972 F.2d 1230 (11th Cir. 1992), the Eleventh Circuit concluded that a government official who allegedly disciplined an employee for an improper reason was performing a discretionary function because it was within the official's discretionary authority to administer disciplinary measures. Id. at 1236. Similarly, in Holloman, the Eleventh Circuit

27

concluded that a government-employed teacher who allegedly chastised a student in violation of his constitutional rights was performing a discretionary function because it was within his discretionary authority to maintain decorum in the classroom. Holloman, 370 F.3d at 1267.

Here, Superintendent Hammonds and the other individual members of the Board have established that they were performing a "discretionary function" when they set the pay scales for Office Assistants.[23]   First, they were performing a "legitimate job-related function" when deciding how much to pay employees.  It is certainly part of their job to make such employment decisions.  Second, the individual Defendants were executing this job-related function in an authorized manner.  The primary purpose of the qualified immunity doctrine is to allow government employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. See, e.g., Harlow, 457 U.S. at 819 & n. 34 (limiting the availability of qualified immunity to situations where "an official's duties legitimately require action" and to "actions within the scope of an official's duties").  The

---

[23] The court notes that although Plaintiffs state that the Defendants were not engaged in discretionary functions, (see doc. # 25 at 19), their brief provides no argument or citation to authority or the record to support these statements.  Instead, Plaintiffs focus on whether they have a clearly established constitutional right of which a reasonable person would have known.  (See id. at 20-22.)

individual Defendants were clearly engaged in an exercise of their statutory discretion.

2.  The Individual Defendants are Entitled to Qualified Immunity.

Because the court concludes that the Defendants were engaged in a discretionary function, the burden shifts to the Plaintiffs to show that the Defendants are not entitled to qualified immunity.  Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir.2003) ("Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.").   Historically, to overcome qualified immunity, the court would apply the following two-part test: the plaintiff  must show that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201-02 (2001); accord, Wilson v. Layne, 526 U.S. 603, 609 (1999).  Recently, however, the Supreme Court held that courts are no longer bound to follow this "inflexible" test.  Pearson v. Callahan, 555 U.S. __, 129 S. Ct. 808, 810 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The court may still apply the two-part inquiry from <u>Saucier</u> when that "order of decisionmaking will best facilitate the fair and efficient disposition of [the] case. <u>Pearson</u>, 555 U.S. __, 139 S. Ct. at 821.  In <u>Pearson</u>, the Supreme Court stated, "Our decision does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases."  <u>Id.</u>  There are still cases where it "is often beneficial" to answer the first inquiry from <u>Saucier</u>.  <u>Id.</u> at 811. "[T]here are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong."  <u>Id.</u> There are other instances when a discussion of whether a constitutional right has been violated would be, at best, fruitless and, at worst, harmful.  <u>Id.</u> at 820-23.

All that being said, here, the court does not need to go into any detail as to either prong of the <u>Saucier</u> test because the court has already concluded that the Defendants did not violate any constitutional right.  <u>See</u> Section IV.A, <u>supra</u>.  As such, the individual Defendants are entitled to qualified immunity, and summary judgment is due to be granted as to those individual Defendants on the claims against them in their individual capacities.

*C.  The State Law Claims Fail as a Matter of Law.*

30

In Count Two of the Complaint, Plaintiffs contend that because they "performed the job classified as Office Assistant I 12 months," they should have been classified as such and paid the same rate of pay as the 12 month Office Assistants. (Compl. ¶ 22.)  They allege that "[b]y improperly classifying Plaintiffs as Office Assistant I 9 ½ months and subsequently as Office Assistant II, Defendants have breached their written policies and salary schedule.  Defendants actions in this regard constitute a violation of school board policy and a breach of contract." (Id. ¶¶ 23-24.)

In their initial brief, Defendants argue that Plaintiffs' state law claims are not cognizable under Alabama law.  (Doc. #18 at 20-22.) Even if they were grounded in any theory recognized under state law, Defendants contend that the claims are barred by sovereign immunity, (id. at 22-25), and the individual defendants are entitled to state agent immunity.  (Id. at 26-28.)  Plaintiffs respond, however, that their "claims arise from Defendants' blatant violation of Alabama Code § 16-22-10(f)[24] and Defendants failure to pay Plaintiffs pursuant to a written salary schedule in place for the Office Assistant I employees."  (Doc. #25 at 22.)  Plaintiffs further maintain that their state law claims are not barred by sovereign immunity (id. at 23-27), and that the

---

[24] Alabama Code § 16-22-10(f) states that "[e]ach city and county board of education shall establish and maintain a written salary schedule for each class and type of employee."

individual defendants were not engaged in a discretionary function, thus extinguishing any state agent immunity.  (Id. at 27-30.)

As well-articulated as Plaintiffs' argument regarding section 16-22-10(f) may be, it fails for one critical reason - the claim is not plead in the Complaint.  Count Two of the Complaint makes the following allegations:

- Defendants' written policies require that employees be placed on salary schedules according to job classification.  (Compl. ¶ 21.)

- Plaintiffs performed the job classified as Office Assistant I 12 months, but were improperly classified as Office Assistant I 9.5 months, although they performed the same job and had the same responsibilities as the 12 month Office Assistants.  (Id. ¶ 22.)

- "The Defendants have a ministerial duty to abide by the laws of the State of Alabama, including a ministerial duty to correctly classify Plaintiffs on the salary schedule."  (Id. ¶ 29.)

- "By improperly classifying Plaintiffs . . ., Defendants have breached their written policies and salary schedule," and their actions "constitute a violation of school board policy and a breach of contract.  (Id. ¶¶ 23-24.)  "The Defendants' failure to properly classify Plaintiffs . . . is a violation of the ministerial duties."  (Id. ¶ 30.)

Nowhere in the Complaint, do Plaintiffs even hint at an allegation of a violation of section 16-22-10(f).  Instead, as outlined above, Plaintiffs' Complaint alleges that they were improperly classified as 9.5 month Office Assistants and should have been paid at the same salary schedule as 12 month Office Assistants.  Plaintiffs may not add a new claim at such a late stage in the litigation.  The time for amendments to the

Complaint expired ten months ago, in June 2009, (see doc. # 7 at 3), and Plaintiffs may not use their brief in opposition to a motion for summary judgment in an attempt to circumvent the court's scheduling orders.

With that being said, viewing the claim actually plead by Plaintiffs in the Complaint, it too fails as a matter of law.  Plaintiffs claim is premised on the notion that they were performing the same duties as 12 month Office Assistants and should have been paid the same hourly rate.  As is thoroughly examined in Section IV.A.1., the record does not establish that premise.  Moreover, the court could not find, and Plaintiffs do not point the court to any, Alabama law or citation to binding precedent that recognize a claim for "improper classification."  Certainly, no Alabama statute recognizes such a claim, and the record is devoid of any evidence of a contract that was allegedly breached by Defendants under these facts.  Therefore, the claims plead under Alabama law fail as a matter of law.[25]

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that Defendants the Jefferson County Board of Education, Phil Hammonds, Jacqueline A.

---

[25] Even if the state law claim was cognizable under Alabama law, the court would decline to exercise supplemental jurisdiction over it.  See 28 U.S.C. § 1367(c).

Smith, Tommy Little, Karen Nix, Ronald Rhodes and Jennifer Parsons  are entitled

to judgment as a matter of law as to all claims asserted by Plaintiffs.

    A separate order will be entered.

    **DONE** this the __13th__ day of April, 2010.

                                                                               SENIOR UNITED STATES DISTRICT JUDGE